**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| DESIGN BASICS, LLC; | ) | |
| PLAN PROS, INC.; CARMICHAEL & | ) | |
| DAME DESIGNS, INC.; and W.L. | ) | |
| MARTIN HOME DESIGNS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 3:16-CV-53-HAB |
| | ) | |
| BIG C LUMBER CO. INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This case, one of more than one hundred similar cases filed by Plaintiff Design Basics, LLC and its related entities, alleges that Defendant Big C Lumber Co., Inc. ("Big C") violated forty-five of Plaintiffs' copyrighted single-family home design plans. Plaintiffs describe Big C's actions as a "brazen" infringement scheme whereby Big C used Plaintiffs' designs to sell building supplies to homebuilders. Big C, on the other hand, claims that the instant litigation is nothing more than another cog in Plaintiffs' copywrite trolling machine and that all the allegedly infringing plans were original creations of Big C's drafters. The parties have filed cross-motions for summary judgment, multiple motions to strike[1], and more than one-hundred supporting and opposing evidentiary exhibits. The Court having reviewed the parties' submissions, this matter is now ripe for determination.

---

[1] Defendant filed four motions to strike: Motion to Strike Portions of Plaintiffs' Affidavit of Pat Carmichael (ECF No. 56); Motion to Strike Portions of Plaintiffs' Affidavit of Paul Foresman (ECF No. 57); Motion to Strike Portions of Plaintiffs' Affidavit of Gregory W. Dodge (ECF No. 64); and Motion to Strike any Reference to Plaintiffs' "Design Basics' Gold Seal" Catalog (ECF No. 65). Because the Court can distinguish which exhibits, affidavits, and statements may properly be considered when deciding whether summary judgment is appropriate, the Court denies Defendant's Motions to Strike. The Court has noted Defendant's objections and will consider the objections to the extent they arise in the Court's summary judgment analysis.

## FACTUAL BACKGROUND

**A.**     *Design Basics' Business Model*

Design Basics describes itself as a small residential design firm founded in Omaha, Nebraska, in the 1980's. Design Basics has designed thousands of home designs from scratch, including more than 390 new designs since 2009. Design Basics registers its architectural works with the United States Copyright Office before or near the time they are published and marketed. Design Basics also acts as an advertising, marketing, and sales agent for other design firms, including the remaining Plaintiffs in this case.

For most of its existence, Design Basics' primary source of income was in licensing its copyrighted designs. Design Basics has more than 164,000 customers across the country that have purchased over 135,000 construction licenses, including more than 2,500 licenses in the last three years alone. Since many of the licenses were good for an unlimited number of builds for the licensed plan, Design Basics states that it is "no exaggeration to say that hundreds of thousands— if not millions—of Americans live in homes designed by" Design Basics. (ECF No. 53-1 at 3).

For much of the time Design Basics was in the licensing business, business was good. Design Basics' licensing fees range from $700 to $6,000. Since 2009, Design Basics has issued more than 9,200 licenses totaling more than $7,135,000.00 in licensing revenue. Design Basics has issued 834 licenses for the forty-five designs at issue in this case since 2009, for a total of $522,576 in licensing revenue. At its peak in the late 1990's and early 2000's, Design Basics was earning more than $4,000,000 per year from licensing revenues.

Design Basics earned these kinds of revenues by making their designs ubiquitous. Design Basics' marketing efforts included:

- Circulating more than ***4.2 million*** of its more than 180 home catalogs;

- Distributing its own publications, such as HER Home Magazine, featuring its designs;
- Placing its copyrighted designs in third-party publications like Builder Magazine;
- Distributing its home plan publications at home shows, conventions, and trade shows; and
- Displaying its copyrighted designs across the internet, including on its own site, www.designbasics.com.

**B.**     ***Design Basics' Business Suffers in the Wake of the Great Recession***

Somewhere between 2006 and 2008, Design Basics decided that it would be easier and cheaper to cease its bulk mailing strategy and instead to focus on marketing through the internet. To that end, Design Basics invested $435,000 in capital improvements, including updating its database system, purchasing and building two new websites, and working to raise its internet profile through search engine optimization ("SEO"). While these efforts succeeded in driving internet traffic to Design Basics' website, they failed in increasing licensing revenue. Instead, licensing revenue dropped from $4 million in 2004, to $1 million in 2009.

**C.**     ***Design Basics Blames Copyright Infringement for its Losses***

Rather than attribute the decline in licensing revenue to the precipitous decline in new home construction,[2] Design Basics determined that its losses were due to "the ready availability of [Design Basics'] copyrighted designs both print and on the internet" which, Design Basics asserts, resulted in "rampant" violations of Design Basics' copyrights. (ECF No. 53-1 at 10). What Design Basics did in response was either an "intellectual property shakedown" and "copyright trolling," *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1096–98 (7th Cir. 2017), or the vigorous protection of its copyrighted works (ECF No. 53-1 at 12), depending on your point of view.

---

[2] Housing starts fell from a high of 2.3 million in January 2006, to 466,000 in January 2009, a drop of nearly 80%. https://money.cnn.com/2009/02/18/news/economy/housing_starts/index.htm

What is undisputed is that Design Basics set out on a concentrated effort to uncover what it viewed as the violation of its intellectual property rights. A large part of this effort was turning its staff and even its independent contractors into copyright detectives. Design Basics "compensated employees or independent contractors . . . who discovered incidents of infringement that led to settlements or judgments by paying them a percentage of the amount recovered from litigation."[3] (ECF No. 53-1 at 12). The detective work was not limited to internet searches for offending designs. Instead, Design Basics conducted multiple "controlled buys"[4] at different lumberyards to find draftsmen who were copying Design Basics's plans. (*Id*. at 11). Due to these investigative techniques, Design Basics discovered four different instances where its designs were being appropriated. (ECF No. 53-1 at 11).

As a result of its investigations, Design Basics has filed suit against approximately 150 builders alleging copyright infringement. This represents a lawsuit against 1 in every 300 builders in the United States. (ECF No. 53-1 at 13). Forty of those lawsuits were filed in Indiana alone. Although Design Basics has not tried one of these lawsuits to a jury, Design Basics claims it does not settle cases for "nuisance value," but instead states that its "settlement revenue reflects *defendants'* assessment of the risks of substantial infringement verdicts." (*Id*.) (original emphasis). Design Basics' owners have recovered significant amounts from these settlements, netting approximately $5 million in 2016 and 2017 alone. These amounts do not appear to have flowed to the business, as gross revenues for Design Basics over those same two years was approximately $2.5 million.

---

[3] Design Basics claims that this practice of compensation ended on September 1, 2017, after this litigation was filed. (ECF No. 73-1 at 11).
[4] A controlled buy is an investigative tool, most commonly used in drug investigations, whereby an individual, generally a confidential informant, purchases contraband from another individual with funds provided by the investigating entity. *See, e.g.*, *United States v. Wilburn*, 581 F.3d 618, 621 (7th Cir. 2009).

**D.** *Design Basics Discovers Big C's Allegedly Infringing Designs*

On July 16, 2013, Paul Foresman, Design Basics' Vice President and Director of Business Development, visited the website of Bayman & Rusk Builders, an Indiana homebuilder. On that website was a plan that Foresman believed to have been copied from Design Basics' Albany plan. The plan included a set of construction drawings with the Big C title block. This led Foresman to believe that Big C had re-drawn the Albany plan for Bayman & Rusk.

Acting on Foresman's suspicions, Design Basics hired Brett Coppins of Coppins Investigative & Security Group in October 2014 to investigate whether Big C's Granger, Indiana location was copying Design Basics' plans. Coppins went to the Granger, Indiana location on October 8, 2014. Upon his arrival, Coppins asked to speak with Kevin Cullen, the individual in charge of Big C's drafting department. Coppins presented Cullen with Design Basics' Morgan plan and asked if Cullen could create construction drawings from the plan.

Cullen indicated that Coppins had two options. First, Cullen could re-draw the plan. Cullen said that this could present a "potential copyright issue," but that the chances of getting caught were "slim to none." (ECF No. 53-6 at 2). To address the copyright issue, Cullen encouraged Coppins to considered making minor changes to the Design Basics plan.

Coppins' second option was to purchase the plans from Design Basics. Cullen advised that the cost of purchasing the plans from Design Basics would be comparable to the cost to have Big C prepare the plans. However, Cullen stated that if Coppins purchased the plans and building materials from Big C, Coppins would receive a rebate on the plans. After determining the available rebates, Cullen quoted $290.00 for Big C to prepare the plans. Coppins agreed and asked Big C to redraw the Design Basics' plan with two minor changes, which Big C did utilizing its drafting software.

Armed with the evidence from Coppins' investigation, Plaintiffs filed the instant action. Through the course of discovery, Plaintiffs allege that they have identified forty-five different designs that were infringed upon by Big C. (ECF No. 37 at 3–5). From those designs, Plaintiffs allege that Big C prepared one hundred different infringing designs. (*Id.* at 7–18).

E.    ***The Battle of the Experts***

Both parties have retained experts for the purposes of comparing the relevant plans. Big C's expert, Robert Greenstreet, is an Oxford-educated architect and the current Dean of the School of Architecture and Urban Planning at the University of Wisconsin-Milwaukee. Professor Greenstreet submitted a twenty-nine-page expert report, accompanied by a seventy-eight-page appendix setting forth what he viewed as the differences between Plaintiff's and Defendants' plans.

Professor Greenstreet recognizes a superficial similarity between the plans but attributes the similarity to the nature of the homes being designed rather than infringement.

> The models, which fall squarely into the category of conventional, modestly priced housing, are generated by basic, functional and economic restrictions and a desire to create a traditional, predicable and recognizably conventional homes which satisfy market acceptability and demand. Consequently, it should not be surprising that so many designs in both Design Basics' portfolio and in the work of other housing companies look familiar. They share a common generic background in both layout and appearance that is embedded in a traditional vocabulary that was pre-existing before copyright protection or the advent of the AWCPA.

(ECF No. 50-3 at 18). Given the general similarity of moderately priced, single-family dwellings, Professor Greenstreet focuses on the details of the plans. As a result of that focus, Professor Greenstreet concludes:

> Despite general similarities normally anticipatable in the traditional, conventional housing market, there are still many differences detectable between the compared models produced by Design Basics and Big C, specifically in their respective square footage, dimensions, program, plan layouts, massing, use of materials and appearance that reject the notion of substantial similarity.

(*Id*. at 27).

Not to be outdone, Plaintiffs submitted a two hundred eighty-eight-page expert report from Matthew McNicholas, a Notre Dame-trained architect and owner of his own architecture firm. Unsurprisingly, McNicholas rejects the opinion of Professor Greenstreet. In large part, McNicholas' rejection of Professor Greenstreet's report stems from his belief that the differences identified by Professor Greenstreet are not differences in design, but instead variations within the same design.

> In my opinion, it is clear that the Big C plan are simple variations on the Plaintiffs' plans, if not outright copies. Any variations are only made to inconsequential and unsubstantial elements of the designs, not the arrangement and composition of spaces or overall form, which constitute the expression of the idea for the design and lie at the heart of what is protectable in an architectural work, as stipulated by the AWPCA. As such, in my opinion, this proves the Big C plans are effective copies of the Plaintiffs' plans, with minor variations that are immaterial to the question of copyright infringement, for example, changing a closet location or rearranging the fixtures in a bathroom.

(ECF No. 58-22 at 36).

McNicholas expounds on this critique in painstaking detail in Section 5B of his report, where he specifically responds to each and every difference identified by Professor Greenstreet. (ECF No. 58–22 at 125–75). In large part, McNicholas' responses fall into one or both of two categories: (1) differences that are "immaterial" because they involve "standard elements"; or (2) differences that do not impact "the overall arrangement and composition of the spaces."

McNicholas' evaluation of the plans is both micro and macro in scope. In Section 7B of his report, McNicholas resizes, reorients, and overlays selected plans to demonstrate what he believes to be the "supersubstantial similarity" between the plans. Those overlays appear as follows (Plaintiffs' design is in black, with Big C's design in blue):

# TRENTON/BOGONIA

First floor:



Second floor:



LANCASTER/FAIRFIELD

First floor:



Second floor:



First floor:



Section 7D presents similar comparisons of the similarities in the front-facing elevations of plans by Plaintiffs and Big C. (*Id*. at 270–81). McNicholas also delves into what he views as the micro-similarities. As in Dr. Greenstreet's report, Section 6 of McNicholas' report is a listing of similarities that he perceives between select plans. (*Id*. at 196–243).[5]

---

[5] A side-by-side comparison of all the allegedly infringed and infringing plans can be found at Exhibit 57 to Plaintiffs' Appendix to their Motion for Summary Judgment.

**F.**     ***Direct Evidence of Copying***

Unlike many cases of this kind, Plaintiffs have submitted to the Court what they allege is direct evidence of copying. Through discovery, Plaintiffs were able to locate several instances where their plans were found in the drafting files of Big C, where Big C made notations on those plans, and where Big C had subsequently prepared plans incorporating Plaintiffs' plans with the notations. Those instances are as follows:

Plaintiffs' plan with markups:



Big C's markups to Big C's plan:



Plaintiffs' plan with markups:



Big C's markups to Big C's plan:



DESIGN BASICS' HEMSWORTH

Plaintiffs' plan with markups:



Big C's markups to Big C's plan:



Similar instances were found with Design Basics' Morgan (ECF No. 53-68), Design Basics' Coleton (ECF No. 53-72), Plan Pro's Babineaux (ECF No. 53-74), Design Basics' Flockhart (ECF Nos. 53-76), and Design Basics' Pinnacle (ECF No. 53-80).

## LEGAL ANALYSIS

A.  *Summary Judgment Standard*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Additionally, a court is not "obliged to research and

construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard. When evaluating each side's motion, the court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

**B.      *Plaintiffs' Motion for Partial Summary Judgment***

Plaintiffs seek summary judgment on three issues: (1) their ownership of valid copyrights in the forty-five designs at issue in this case; (2) their claims of infringement on the seven designs for which they have submitted direct evidence of copying; and (3) their claims under the Digital Millennium Copyright Act ("DMCA") with respect to the Waterstone, Morgan, and Flockhart plans. The Court will address each issue in turn.

1.      *Ownership of Copyrights*

Whether a work is copyrightable is an issue of law for the court. *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 517 (7th Cir. 2009) *citing Gaiman v. McFarlane*, 360 F.3d 644, 648–49 (7th Cir. 2004). Therefore, determinations of copyrightability are appropriate for summary judgment. *Woods v. Resnick*, 725 F. Supp. 2d 809, 817 (W.D. Wis. 2010).

A claim of copyright infringement has two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Pub''ns, Inc. v. Rural Tel. Serv. Co., Inc*. 499 U.S. 340, 361 (1991); *Schrock*, 586 F.3d at 517. As a constitutional and statutory matter, "[t]he sine qua non of copyright is originality." *Feist Publ'ns, Inc.*, 499 U.S. at 345; *Schrock*, 586 F.3d at 518–19. Copyright law assures authors of "original" creative works that

others will not profit from their designs without their approval. *Feist Publ'ns, Inc.*, 499 U.S. at 345–56; 17 U.S.C. § 102. To be original, a work must: (1) be independently created by the author, rather than copied from other works; and (2) "possess[] at least some minimal degree of creativity." *Feist Publ'ns, Inc.*, 499 U.S. at 345, *citing* 1 M. Nimmer & D. Nimmer, Copyright §§ 2.01[A], [B] (1990). "To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice." *Feist Publ'ns, Inc.*, 499 U.S. at 345.

To benefit from copyright protections, "the author must register the design with the United States Copyright Office, a division of the Library of Congress." 17 U.S.C. §§ 408, 412, 701. Registration is a prerequisite to a suit to enforce a copyright so that "an application to register must be filed, and either granted or refused, before suit can be brought." *Gaiman*, 360 F.3d at 654–55, *citing* 17 U.S.C. § 411(a). The existence of a certificate of copyright is *prima facie* evidence of its validity. 17 U.S.C. § 410(c).

Plaintiffs have designated the Certificate of Copyright Registration for each of the plans at issue in this case. (ECF Nos. 53-12 through 53-54; 53-56; 53-62). Accordingly, if Big C wished to contest the validity of Plaintiffs' copyrights, it was necessary that it designate evidence to rebut this presumption. *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994). Although Professor Greenstreet suggests that "the Design Basics' models at issue contain no expressions of originality or creativity" (ECF No. 50-3 at 21), Big C makes no argument challenging the validity of the copyrights in its Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment (ECF No. 55). Therefore, the Court will assume that the issue of validity is not contested by Big C. In any event, the Court concludes that the plans clear the "extremely low" bar of creativity required to support the validity of a copyright and concludes that

summary judgment is appropriate in Plaintiffs' favor on the issue of their ownership of valid copyrights in the forty-five plans at issue in this case.

2.    *Infringement of Plaintiffs' Copyrights*

Copyright protection for "architectural work" is now[6] provided under the AWCPA, which defines such work as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The protected work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. §§ 101, 102(a)(8). In enacting the AWCPA, Congress intended to extend protection to the "arrangement and composition of spaces and elements" in architectural works, in recognition of the fact that "creativity in architecture frequently takes the form of a selection, coordination, or arrangement of [non-protected] elements into an original, protectable whole." H.R. Rep. No. 101–735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6949. However, the protections of the AWCPA were not intended by Congress to afford copyright protection to "individual standard features," such as "common windows, doors, and other staple building components." *Id.*

To prevail on a copyright claim, a plaintiff must prove both ownership of a valid copyright and that the defendant copied original or "protectible" aspects of the copyrighted work. *Feist Publ'ns, Inc.*, 499 U.S. at 348. Copying can be proved two ways. First is direct evidence of copying, but this is "rarely available." *Lexington*, 858 F.3d at 1099. The second is by showing that the defendant had access to the copyrighted work, and that the works in question are "substantially similar" such that an inference of copying can be made. *Id.*

---

[6] Prior to the AWCPA, architectural plans could receive copyright protection as "pictorial, graphic, and sculptural works," but structures were not protected. *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 188 (2nd Cir. 2012).

The common theme that binds decisions in this area is the idea that only expression is protected. However, the definition of protectable expression can be elusive. The distinction between protectable expression and non-protectable ideas is often described in flowery, poetic terms. Take, for example, Judge Learned Hand who explained the distinction as follows:

> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930). The legislative history provides equally creative descriptions for the distinction. Architect Michael Graves, a witness before the Judiciary Subcommittee, testified that there are:

> two types of architectural language, "internal" and "poetic." Internal language is "intrinsic to building in its most basic form–determined by pragmatic, constructional, and technical requirements." Poetic language is "responsive to issues external to the building, and incorporates the three-dimensional expression of the myths and rituals of society."

H.R. Rep. No. 101–735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6950. The intent of the legislation is to protect only what Graves calls "poetic language." *Id.*

The "internal architectural language" described by Graves is separately referred to as the doctrine of *scenes a faire* by reviewing courts. Essentially, the doctrine "teaches that elements of a work that are 'indispensable, or at least standard, in the treatment of a given topic' . . . get no protection." *Lexington*, 858 F.3d at 1102. A corresponding doctrine, the doctrine of merger, provides that "some ideas can only be expressed in a limited number of ways such that idea and expression merge, with the resulting amalgam receiving no copyright protection." *Id.* (citations omitted).

In their Motion for Partial Summary Judgment, Plaintiffs rely on a direct evidence theory to prove copying. (ECF No. 52 at 22). Big C, on the other hand, defends against Plaintiffs' Motion by arguing that its drafters lacked access to Plaintiffs' plans and that Plaintiffs' plans are not substantially similar to the allegedly infringing plans. (ECF No. 55 at 11–21). Big C's arguments, then, necessarily miss the mark as Plaintiffs are not proceeding under the access/similarity method of proving copying. Instead, Plaintiffs assert that they have actual, direct evidence that Big C copied their designs. Accordingly, Big C's Response in Opposition does little to aid the Court in its determination of Plaintiffs' Motion. Therefore, it is necessary to look at the evidence designated by Plaintiffs with respect to each of the allegedly directly copied works and determine, as a matter of law, whether Plaintiffs have met their summary judgment burden.

a.    Waterstone, Morgan, Seabeck, and Hemsworth

The fact pattern for each of these designs is substantively the same. An individual would bring Big C one of Plaintiffs' protected designs and then request certain changes to the design. (ECF No. 53-64 at 5; 53-70; 58-22 at 265). Big C then incorporated Plaintiffs' designs and the requested changes into construction drawings as shown on pages 12 through 14 above. (ECF No. 53-66; 53-68; 53-70; 58-22 at 265)

Plaintiffs argue that Big C created derivatives of its protected designs when it based its drawings on their copyrighted designs. A "derivative work" is a work "based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. Copyright law grants the owner of a copyright the exclusive right to prepare derivative works based on the copyrighted work. 17 U.S.C. § 106(2); *Pickett v. Prince*, 207 F.3d 402, 405 (7th Cir. 2000). "It is

very difficult to see how a derivative work not made by the owner of the original work could fail to infringe it, given the definition of derivative works." *Pickett*, 207 F.3d at 406.

Big C offers little in response. It claims that its was provided with a preliminary set of drawings by its customer based off of the Waterstone but does not contest the fact that the hand-written changes from Plaintiffs' plan were incorporated into the final construction drawings. (ECF No. 56-65 at 28). For the Morgan, Big C simply notes that its copied drawings were preliminary in nature. (ECF No. 55 at 11–12). However, Big C directs this Court to no authority making the preliminary nature of the drawings relevant to the infringement issue, and the Court can find none. For the Seabeck, Big C claims that the plans it was provided did not inform it that the design was copyrighted. (ECF No. 55 at 12). Whether or not this is true (Plaintiffs' urge that it is not), intent is a damages issue in an infringement case. *Halo Elec., Inc. v. Pulse Elec., Inc.*, 136 S. Ct. 1923, 1932 (2016). Copyright infringement is a strict liability offense. *Boehm v. Zimprich*, 68 F. Supp. 3d 969, 977 (W.D. Wisc. 2014). In light of Big C's inability to refute the claims of copying and given the overwhelming evidence in the form of documentary evidence that copying occurred, the Court has little trouble concluding that Big C copied elements of the Waterstone, Morgan, Seabeck, and Hemsworth designs.

That being said, a finding that Big C copied certain elements of Plaintiffs' plans does not end the inquiry. Copyright law does not prohibit copying, but instead the copying of original or "protectible" aspects of the copyrighted work. *Feist Publ'ns, Inc.*, 499 U.S. at 348. Viewing the evidence in a light most favorable to Big C, which the Court must when reviewing Plaintiffs' Motion for Summary Judgment, the Court cannot conclude that the copying that did occur was of original aspects of Plaintiffs' designs. Professor Greenstreet's report directly addresses this point

and finds that no parts of Plaintiff's designs are sufficiently original so as to merit protection by the copyright laws. Specifically, Professor Greenstreet concluded:

> Therefore, it is my opinion that the Design Basics' models at issue contain no expressions of originality or creativity either in their building elements or in the arrangement, selection or composition of these elements, or in their overall form. Instead, the units conform to an expected formula of traditional rooms and spaces that are conventionally arranged and predicable in appearance, and are comparable to the products of many other housing competitors across the country.

(ECF No. 50-3 at 21–22). While it is true that McNicholas vehemently disagrees with this assessment in his expert report, *see* ECF No. 58-22 at 36 ("In my opinion this notion is not only impossible, it is completely fabricated."), this does nothing more than create a genuine issue of material fact for a jury to resolve. *G. R. Leonard & Co. v. Stack*, 386 F.2d 38, 40 (7th Cir. 1967) (holding that the extent of the use of protected material is a factual question). Therefore, even though this Court concludes that Big C did copy the Waterstone, Morgan, Seabeck, and Hemsworth designs, it must nonetheless deny Plaintiffs' Motion for Summary Judgment to the extent that it seeks a determination that Big C infringed its copyright on those designs.

b.      Coleton, Babineaux, Flockhart, and Pinnacle

Despite being classified by Plaintiffs as exhibiting the same direct evidence of copying as the four designs discussed above, the evidence with respect to the Coleton, Babineaux, Flockhart, and Pinnacle designs is far more tenuous. For each of these designs, the designated evidence shows that Plaintiffs' design was just one of many different designs and design ideas contained in Big C's drawing files. *See* ECF Nos. 53-72; 53-74; 53-76; 53-78; 53-80. In each of these cases, the final Big C drawings were either an amalgam of several different design ideas or had undergone so many consumer-driven modifications that it could no longer fairly be said that the design was that of Plaintiffs.

These designs demonstrate the key distinction between idea and expression in copyright cases. As noted above, copyright protection is given only to the expression of an idea – not the idea itself. *Mazer v. Stein*, 347 U.S. 201, 217 (1954). While the Court does not question the fact that *ideas* from Plaintiffs' designs were borrowed from each of these four designs, it cannot find that the *expression* of those ideas has been copied in Big C's final plans. Instead, the expression is ultimately that of Big C's customer, who has either provided the many different designs or has made numerous, significant changes to the designs over the course of multiple drafts. The final drawings, then, are simply too far afield from Plaintiffs' protected designs for the Court to conclude that the presence of those designs in the drawing files is direct evidence of copying.

Even if this Court were to conclude that the Coleton, Babineaux, Flockhart, and Pinnacle designs had been copied, the infringement claim would still suffer from the same evidentiary questions raised by Professor Greenstreet's report. The Court would still be unable to determine, as a matter of law, whether Big C had copied protectible portions of Plaintiffs' designs. Accordingly, regardless of the Court's conclusion on the copying question, summary judgment would not be appropriate.

3.      *DMCA Claims*

The DMCA makes it illegal for an individual, without the authority of the copyright owner, to "intentionally remove or alter any copyright management information" with knowledge that it will "induce, enable, facilitate, or conceal an infringement of any right" provided under the copyright statutes. 17 U.S.C. § 1202(b)(1). To prevail on a claim for the removal of copyright management information ("CMI"), a plaintiff must show, "(1) the existence of CMI on the work at issue; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally." *Fischer v. Forrest*, 286 F. Supp. 3d 590, 608 (S.D.N.Y. 2018).

Additionally, a claimant cannot recover on a DMCA claim where there has been no infringement of the copyrighted work. *Monotype Imaging, Inc. v. Bitstream, Inc.*, 376 F. Supp. 2d 877, 893 (N.D. Ill. 2005).

Here, Plaintiffs seek summary judgment on their DMCA claims related to their Waterstone, Morgan, and Flockhart designs. For each of these designs Plaintiffs have shown that CMI was on their original designs, and that it did not appear on Big C's final drawings. However, as discussed above, Plaintiffs have not demonstrated as a matter of law that Big C's drawings are infringing on their designs. Since there must be infringement for a DMCA claim to prevail, Plaintiff's request for summary judgment on the DMCA claims must fail. In addition, Plaintiffs have submitted no evidence regarding the state of mind of Big C's employees in removing the CMI. Therefore, they have failed to demonstrate the requisite intent. *Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, 999 F. Supp. 2d 1098, 1103 (N.D. Ill. 2014) ("The statutory language indicates that knowledge or intent is required.").

In summary, this Court finds that Plaintiffs are entitled to summary judgment on the issue of their ownership of valid copyrights in the forty-five designs at issue. However, Plaintiffs are not entitled to summary judgment on their claims for infringement of those designs, or their claims under the DMCA. There remain genuine issues of material fact on those claims that must be determined by a jury.

### C.     *Big C's Motion for Summary Judgment*

Big C has moved for summary judgment on three grounds: (1) Plaintiffs' designs cannot be infringed upon because they lack the requisite creativity; (2) Big C did not infringe upon Plaintiffs' designs because it did not have access to the designs and Big C's drawings are not substantially similar to the designs; and (3) Plaintiffs' have failed to demonstrate the requisite

intent to establish a violation of the DMCA. Once again, the Court will address each argument in turn.

1.    *Requisite Creativity*

As noted above, copyright law does not prohibit copying, but instead the copying of original or "protectible" aspects of the copyrighted work. *Feist Publ'ns, Inc.*, 499 U.S. at 348. The protectable elements are those that possess originality. *Schrock*, 586 F.3d at 518–19. Originality requires that the elements be independently created and possess at least some minimal degree of creativity. *Id.* at 519.

Big C argues, based upon the report of Professor Greenstreet and the Seventh Circuit's decision in *Lexington*, that Plaintiffs' designs cannot be infringed upon because they lack the minimal degree of creativity necessary to be protected. However, just as Professor Greenstreet created a genuine issue of material fact as to Plaintiffs' claims of creativity, McNicholas creates the same problem for Big C. Specifically, McNicholas has opined:

> It is my opinion that even when excluding standard elements and functional requirements (I reject the notion that "traditional configurations of space" cannot have originality) the Plaintiffs' designs have protectable expressions of the ideas of entertainment, flexibility, and privacy that have been infringed upon in plan, and in elevation.

(ECF No. 58-22 at 93). This opinion is sufficient to create a genuine issue of material facts as to protectability.

In addition, as noted above, Plaintiffs have actually copyrighted each of the designs at issue. The existence of a certificate of copyright is *prima facie* evidence of its validity. 17 U.S.C. § 410(c). Since originality is a requirement for copyrightability, *Feist Publ'ns, Inc.*, 499 U.S. at

345; *Schrock*, 586 F.3d at 518–19, the Court finds that the existence of the copyrights, in and of themselves, would create a genuine issue as to whether the designs are protectable.[7]

2.    *Access*

Big C next asserts that it is entitled to summary judgment because Plaintiffs cannot prove that it had access to any of the plans at issue. In support of this argument, Big C states that its drafters had never heard of the Plaintiffs prior to this litigation and had not reviewed Plaintiffs' websites or catalogs. In addition, Big C claims that the designs at issue are not sufficiently similar to give rise to an inference of access. (ECF No. 50-1 at 11).

Big C is correct that Plaintiffs must demonstrate that it had access to the protected designs. "Without access, there can be no copying and no viable claim for copyright infringement." *Lexington*, 858 F.3d at 1105. Plaintiffs must present evidence of access, as the Court will not permit a jury to make a finding of access based on speculation. *Id.*, citing *Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984). A showing of access can be made by demonstrating that the protected work was widely disseminated, or that the work was sent directly to the defendant or its close associates. *Lexington*, 858 F.3d at 1100.

The problem with Big C's argument on access is that, regardless of the testimony of its drafters, Big C had Plaintiffs' designs in its possession. As noted in Section B.2. above, Big C had at least eight of Plaintiffs' designs in multiple drafting files. Accordingly, the Court does not have to concern itself with Big C's hypothetical ability to obtain Plaintiffs' drawings or deal in inferences; there is direct evidence that Big C had actual access to Plaintiffs' designs. As Plaintiffs

---

[7] The Court recognizes that, in Section B.1. above, it determined as a matter of law that Plaintiffs' copyrights were valid. In ruling on cross-motions for summary judgment, "the court must consider each motion independently." *Aearo Corp. v. Am. Inter. Specialty Lines Ins. Co.*, 676 F. Supp. 738, 741 (S.D. Ind. 2009). Big C did not challenge the validity of Plaintiffs' copyrights in its response to Plaintiffs' motion, resulting in summary judgment in Plaintiffs' favor on that issue. Big C does challenge the validity of the copyrights in its Motion for Summary Judgment. Big C's inconsistent positions have created the inconsistent, yet necessary, determinations on this issue.

correctly note, evidence that Big C had access to some of Plaintiffs' designs is sufficient to create a genuine issue of fact as to whether Big C had access to the rest of Plaintiffs' designs. *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997).

3.      *Substantial Similarity*

Even if one discounts the unfavorable descriptions of Design Basics' litigation tactics, *Lexington*, which affirmed summary judgment against Design Basics, nonetheless presents significant issues for architects claiming copyright protection for single-family homes. The intellectual basis for the *Lexington* decision is the idea that, particularly in cases involving homes like the ones at bar, "the designer's or architect's copyright [is] thin, so that only very close copying of protected elements is actionable." *Id.* at 1101.

> The challenge of proving substantial similarity is heightened where the field is crowded or where aesthetic choices may be secondary to consumer demands or functional requirements. The challenge is particularly acute in the market for affordable designs for single-family homes, where form follows function so closely. Blueprints drafted by companies like Design Basics and Lexington are meant to appeal to home builders and buyers who want to build, sell, and buy homes that will hold their value. While it is possible to design a home that is a one-of-a-kind work of art, the home designs here do not fit that description. They comprise familiar configurations of spaces and features, having less in common with the work of Frank Gehry or Frank Lloyd Wright and more with that of William Levitt.

*Id.*

Given the similarities, the Seventh Circuit requires an "analytic" review of plans in making the substantial similarity determination. A district court cannot survey plans "from 30,000 feet, or even 500 feet." *Id.* at 1105. Applying this analytic review, the Seventh Circuit determined that "aesthetic distinctions" rendered the plans in *Lexington* sufficiently dissimilar.

> As noted, a close study of Design Basics' and Lexington's plans reveals many aesthetic distinctions, further undercutting Design Basics' claim that Lexington took anything that belonged to it. Dr. Greenstreet, Lexington's expert, identified 46 differences between Design Basics' Aspen and Lexington's Carlisle; 54 differences between Design Basics' Kendrick and Lexington's Oakridge; 49 differences

> between Design Basics' Taylor and Lexington's Ashwood; and 62 differences between Design Basics' Womack and Lexington's Easton. Dr. Greenstreet spotted differences in dimensions and spatial relationships, in roofing configurations and building materials, and in carpentry and decor. Given the economic and functional constraints on the designers and the vast body of similar designs in the public domain, these many differences are not trivial.

*Id*. at 1103 (footnote omitted). Accordingly, this Court views *Lexington* as requiring the Court to focus on the differences between the plans rather than the similarities. Where sufficient differences exist, the existence of superficial similarity cannot demonstrate a copyright violation.

Not surprisingly, Plaintiff would prefer that this Court not rely on a case that names it a "copyright troll." Although Plaintiff understands that this Court is bound by *Lexington*, it nonetheless suggests that the First Circuit's decision in *T-Peg, Inc. v. Vermont Timber Works, Inc.*, 459 F.3d 97 (1st Cir. 2006) "better appies the AWCPA as Congress intended it." (ECF No. 62 at 20, n.6). This decision is illustrative of a different approach to the substantial similarity issue, but one that must ultimately yield to the approach in *Lexington*.

> *T-Peg* focused its analysis on the similarities between works rather than the differences.

> Substantial similarity can be measured by the ordinary observer test. Under that test, two works will be said to be substantially similar if a reasonable, ordinary observer, upon examination of the two works, would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression. The two works need not be exact copies to be substantially similar. Differences between the works have some effect on the inquiry, but the mere existence of differences is insufficient to end the matter in the defendant's favor. If the points of dissimilarity not only exceed the points of similarity, but indicate that the remaining points of similarity are, within the context of plaintiff's work, of minimal importance, either quantitatively or qualitatively, then no infringement results.

*Id*. at 112 (citations omitted). Unlike *Lexington*, *T-Peg* advises that summary judgment on the issue of substantial certainty should be "unusual." *Id*.

Applying the ordinary observer test, the Court noted seven similarities between the relevant plans, and four differences. *Id*. at 113. The Court found that the differences "can be addressed to

the jury," but were not dispositive. *Id.* at 115. In short, *T-Peg* seemingly stands for the proposition that, where there are similarities in design, differences do little more than raise issues for a jury to decide.

While the differences between *Lexington* and *T-Peg* are significant, the Court would suggest that the differences are more likely the result of the buildings at issue rather than any fundamental difference in the interpretation of the AWCPA. The building at issue in *T-Peg* (a one-off timber frame home) unquestionably provided for more latitude and creativity than moderately priced, single-family homes. While the parties here are bound to design homes that are affordable, resaleable, and widely appealing, the architects in *T-Peg* had no such limitations.

Instead, the architects in *T-Peg* had the freedom to design a purpose-built structure for an idiosyncratic customer. It makes sense that, in those situations, similarities would have more relevance. The design in *T-Peg* was never intended to be duplicated, so duplication of any aspect of those designs is necessarily suspect. That is not so in the designs at issue here. The only way one can design homes that can house the millions claimed by Plaintiffs is to prepare designs that can appeal to people across ethnic, socioeconomic, and cultural lines. They must be designed, then, to be generally like other popular home designs. The whole point of Plaintiffs' designs is that they are easily reproducible for a wide variety of customers (as evidenced by the fact that many of the licenses it sold were for unlimited builds). Where reproducibility is a virtue, similarities to other structures will necessarily exist. In those kinds of cases, then, it makes sense to focus on differences. Since this case is in the latter category, the Court concludes that the analysis in *Lexington* is more applicable here.

Regardless of which approach this Court would prefer, it is bound by Seventh Circuit precedent. Thus, *Lexington* controls. *Lexington* requires that this Court view the plans objectively

to determine "whether the accused work is so similar to the plaintiff's work that an ordinary, reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Lexington*, 858 F.3d at 1101. In applying this test, the Court must be mindful of the Seventh Circuit's determination that Plaintiffs' copyright is thin, and that only very close copying of protected elements is actionable. *Id*.

The parties have essentially designated three pieces of evidence from which to make the substantial similarity decision: (1) Professor Greenstreet's report; (2) McNicholas' report[8]; and (3) the affidavits of Big C's draftsmen.[9] Having reviewed each of those pieces of evidence in light of *Lexington*, and giving every reasonable inference to Plaintiffs, this Court concludes that summary judgment is appropriate on some but not all of the designs at issue.

a.  Expert Reports

For reasons known only to Big C and its counsel, Professor Greenstreet does not provide the Court with a detailed analysis of each of the designs at issue in this case. Instead, Professor Greenstreet has focused on only three of Plaintiffs' designs: the Lancaster II, Trenton, and Mayberry designs. Professor Greenstreet represents to the Court that he has reviewed the other designs and determined "that none of the Big C designs listed in the First Amended Complaint are substantially similar to the Design Basics' models," but this is little more than a conclusion without

---

[8] The Court notes that at least one court has concluded that expert testimony cannot be used to determine substantial similarity because "the ordinary observer test is an objective one." *Trek Leasing, Inc. v. United States*, 66 Fed. Cl. 8, 18 (2005). Despite designating a detailed expert report in support of its Motion for Summary Judgment, Defendant appears to make a similar argument in its Reply. (*See* ECF No. 78 at 4–5). Because the Seventh Circuit in *Lexington* approved of the use of an expert report as an "analytical tool" in that case, this Court finds that the expert reports are properly considered here.

[9] Plaintiffs also designated a complete set of plan comparisons in support of their Motion for Summary Judgment but did not designate a similar set of plan comparisons in opposition to Big C's Motion for Summary Judgment. Accordingly, the plan comparisons cannot be considered by the Court in reviewing Big C's Motion. *Aearo Corp.*, 676 F. Supp. at 741.

supporting evidence. As such, it does nothing to aid the Court in its determination. *United States v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987).

Professor Greenstreet's report is helpful for those designs he has reviewed in-depth. He has identified dozens of differences between Plaintiffs' designs and Big C's drawings: 103 differences between the Trenton and Bogunia; 67 differences between the Mayberry and Woods Trail; and 67 differences between the Lancaster II and Fairfield. These differences, which relate to the dimensions, spatial relationships, configurations, building materials, and décor are more than sufficient to find, as a matter of law, that the designs are not sufficiently similar. *Lexington*, 858 F.3d at 1103.

In his report, McNicholas addresses each difference identified by Professor Greenstreet and opines that all of them are irrelevant for the purposes of the infringement determination. (ECF No. 58-22 at 126-75). Generally, "genuine differences of expert opinion addressed to the relevant factual question are expressed in opposing affidavits, the case is not a proper case for summary judgment." *United States v. 7 Cartons, More or Less * * * "Ferro-Lac Swine Formula Concentrate (Medicated)"*, 293 F. Supp. 660, 663 (S.D. Ill. 1968), *aff'd in part, vacated in part sub nom. United States v. Seven Cartons, More or Less, "Ferro-Lac Swine Formula Concentrate"'*, 424 F.2d 1364 (7th Cir. 1970). However, inherent in that statement is the assumption that both experts are addressing the "relevant factual question." Because this Court finds that McNicholas does not address the substantial similarity question in a way recognized by the Seventh Circuit, this Court concludes that his report cannot create a genuine issue of material fact.

The fundamental problem with McNicholas' report is that his view of what constitutes a "difference" between plans as an architect is different from what constitutes a "difference" under

Seventh Circuit precedent. No excerpt from his report sums up this problem more than McNicholas' following statement:

> Identifying the differences of individual standard or functional elements such as doors, windows, and roofs is just as immaterial as identifying the similarities in those elements.

(ECF No. 58-22 at 82). The Court does not doubt McNicholas' belief in this statement, as he makes similar remarks throughout his report. Unfortunately for Plaintiff, the Seventh Circuit does not share this belief.

The very differences that McNicholas' labels "immaterial" are the differences that the Seventh Circuit relied upon in *Lexington*. There, the court noted "many aesthetic distinctions," including "differences in dimensions and spatial relationships, in roofing configurations and building materials, and in carpentry and décor." *Lexington*, 585 F.3d at 1103. Note 5 to the decision expounds on the differences the court viewed as relevant, which included differences in doors, windows, tubs, washbasins, and roofs, as well as dimensions. *Id*. at 1103, n.5. Because McNicholas' opinion is based upon excluding these very differences from his analysis, it cannot create a genuine issue of fact under *Lexington*.

On the basis of the foregoing, the Court concludes that only Professor Greenstreet accurately evaluates the designs using the legal standard in *Lexington*. Since his report sets forth sufficient differences in the designs to defeat any assertion of substantial similarity, summary judgment in favor of Big C is appropriate. Therefore, summary judgment in favor of Big C will be entered with respect to the Trenton, Mayberry, and Lancaster II designs.

b.      Drafters' Affidavits

Unfortunately for Big C, its drafters do not identify differences between plans with the same efficiency and thoroughness of Professor Greenstreet. Cullen (ECF No. 50-4), Lucas Ciula (ECF No. 50-7), Gary Klaybor (ECF No. 50-6), and Todd Evard (ECF No. 50-5) all submit affidavits in which they attempt to identify differences between the allegedly infringing designs and their Design Basics' counterpart. Rather than submit 60+ differences like Professor Greenstreet, the drafters universally identify less than twenty differences, and in some cases only five, across each design (*see*, *e.g.*, ECF No. 50-5 at 5).

While *Lexington* does not establish a minimum number of differences that defeat a claim of substantial similarity, the use of the term "similarity" establishes that the Seventh Circuit does not require that an infringing plan be identical to a protected plan before a cause of action would lie. A single difference will not suffice. The forty-two designs that are not the Trenton, Mayberry, or Lancaster II all fall into a gray area between a single difference and the dozens of differences noted in *Lexington*. Within this gray area the Court concludes that an objective viewer, and therefore a reasonable jury, could find that Big C's drawings are substantially similar to Plaintiffs' designs. Therefore, the Court concludes that summary judgment is inappropriate on the remaining plans and will deny Big C's Motion with respect to those designs.

4.      *DMCA Claims*

The Court has discussed Plaintiffs' DMCA claims in Section B.3. above, and the factual designations for Big C's Motion for Summary Judgment do not change the analysis. While Plaintiffs can show that their designs contained CMI and can further show that Big C's drawings omit that CMI, Plaintiffs have submitted no evidence suggesting, much less proving, that the omission of the CMI was intentional. Since the showing of intent is a requirement for establishing

a violation of the DMCA, *Leveyfilm, Inc.*, 999 F. Supp. 2d at 1103, Plaintiffs' DMCA claim must necessarily fail. Therefore, summary judgment will be entered in favor of Big C on Plaintiffs' DMCA claims.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment (ECF No. 51) will be GRANTED in part and DENIED in part. The Court will grant Plaintiffs' request for summary judgment on their ownership of valid copyrights for each of the forty-five designs at issue. Plaintiffs' Motion will be denied to the extent that it seeks judgment finding that Big C infringed their copyrights and violated the DMCA. Big C's Motion for Summary Judgment (ECF No. 50) will be GRANTED in part and DENIED in part. The Court will grant summary judgment finding that Big C did not infringe the Trenton, Mayberry, or Lancaster II plans. The Court will deny Big C's Motion for Summary Judgment on Plaintiffs' infringement claims on the remaining designs. The Court will also grant Big C's motion on Count 9 of Plaintiffs' First Amended Complaint alleging violations of the DMCA. Accordingly, this case will proceed on Plaintiffs' infringement claims only with respect to all designs listed in the First Amended Complaint other than the Trenton, Mayberry, or Lancaster II designs.

SO ORDERED on July 22, 2019.

 s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT